IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELINDA FRIEND, et al., | No. C-07-5222 MMC |
| Plaintiff, | **ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO STRIKE** |
| v. | |
| HERTZ CORPORATION, | |
| Defendant. | |

Before the Court is plaintiffs' Motion for Class Certification, filed September 17, 2010. Defendant The Hertz Corporation ("Hertz") has filed opposition, plaintiffs have filed a reply, defendant has filed a surreply, and plaintiffs have filed a response to the surreply. Additionally, each of the parties, at the direction of the Court, has filed a supplemental memorandum to address, inter alia, issues of standing. Also before the Court is defendant's Motion to Strike, filed October 15, 2010. Plaintiffs have filed opposition thereto, and defendant has filed a reply. Having read and considered the above-referenced filings, the Court rules as follows.[1]

**BACKGROUND**

Each of the plaintiffs was formerly employed by Hertz as a "Location Manager 1" or a "Location Manager 2," and each worked at a Hertz airport location in California. Plaintiffs

---

[1] By order filed February 1, 2011, the Court took the motions under submission.

allege that Hertz improperly classified as exempt from California overtime laws, as well as from California laws pertaining to meal and rest periods, persons working at its airport locations as Location Managers 1 and Location Managers 2. Plaintiffs also allege that, in light of such classification, Hertz did not pay plaintiffs overtime for work performed in excess of 8 hours a day and 40 hours a week (see Second Amended Complaint ("SAC") ¶¶ 42-43), did not provide them with the meal and rest periods applicable to persons not classified as exempt (see SAC ¶ 50), and, upon termination, did not provide them all wages due, in that they were not paid overtime wages (see SAC ¶ 62). Plaintiffs also allege Hertz has a vacation policy that did not allow plaintiffs to "carry over any accrued vacation hours into a new calendar year," in violation of California law. (See SAC ¶ 53.)

**DISCUSSION**

By the instant motion, plaintiffs seek to certify a class defined as follows: "All current and former employees of Hertz who have held the title of Location Manager 1 (aka Station Manager) or Location Manager 2 (aka Station Manager 2) at a Hertz airport location in California." (See Pl.'s Notice of Motion, filed September 17, 2010, at 1:7-8.) Additionally, plaintiffs seek certification of two subclasses, one comprised of class members who "hold or have held the title of Location Manager 1 (aka Station Manager 1), and the other comprised of class members who "hold or have held the title of Location Manager 2 (aka Station Manager 2)." (See id. at 1:10-12.)[2]

Hertz has classified all persons employed in the position of Location Manager 1 or Location Manager 2 as "executive and/or administrative employees" under California law. (See Def.'s Answer, filed June 30, 2008, ¶ 9.) Plaintiffs argue that resolution of plaintiffs'

---

[2]During the course of discovery, Hertz disclosed that 339 persons (1) had worked as Location Managers at its California airport locations between September 6, 2003 and the date of such disclosure, which appears to have been in January 2009, and (2) had not "opt[ed] out of having their contact information forwarded to [p]laintiffs' counsel." (See Konecky Decl., filed September 17, 2010, ¶ 10.) Neither party has advised the Court as to the number of Location Managers hired after the date of the above-referenced disclosure or the number thereof who "opt[ed] out of having their contact information forwarded to [p]laintiffs' counsel." Based on the record presented, however, it appears likely that the number of potential class members is in excess of 339.

2

claims, with the exception of their claim involving Hertz's vacation policy, is dependent upon whether Hertz's classification was proper. Plaintiffs further argue that the propriety of Hertz's classification is suitable for class-wide determination.[3]

**1. Statutory and Administrative Background**

Under California law, an employer must pay an employee overtime wages for work performed in excess of eight hours in one day or 40 hours in one week. See Cal. Labor Code § 510(a). Additionally, an employer must provide an employee with a 30-minute meal period in each five-hour work period, see Cal. Code Regs. tit. 8, § 11040(11)(A), and a ten-minute rest period for each four hours worked, see Cal. Code Regs. tit. 8, § 11040(12)(A), and, if the employer does not provide a meal or rest period, the employer must pay the employee one additional hour of pay for each work day that the meal or rest period was not provided, see Cal. Lab. Code § 226.7(b). Such overtime pay and meal/ rest-period provisions do not apply, however, to a person employed in an "executive capacity" or an "administrative capacity." See Cal. Code Regs. tit. 8, § 11040(1)(A).

An exempt "executive" employee is a person

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in [enumerated federal regulations]. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed

---

[3]Although plaintiffs' motion includes two brief references to plaintiffs' vacation policy claim, plaintiffs have not addressed how certification of such claim on behalf of a class is proper under Rule 23. Accordingly, the Court does not consider the issue herein.

3

    as a means for carrying out exempt functions.  The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

    (f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. . . .

See Cal. Code Regs. tit. 8, § 11040(1)(A)(1).

    An exempt "administrative employee" is a person

    (a) Whose duties and responsibilities involve either:

        (I) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; or

        (II) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

    (b) Who customarily and regularly exercises discretion and independent judgment; and

    (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

    (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

    (e) Who executes under only general supervision special assignments and tasks; and

    (f) Who is primarily engaged in duties that meet the test of the exemption.  The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in [enumerated federal regulations].  Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions.  The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

    (g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. . . .

See Cal. Code Regs. tit. 8, § 11040(1)(A)(2).

For purposes of both of the above exemptions, the word "primarily," as used in the term "primarily engaged in duties that meet the test of the exemption," means "more than one-half of the employee's work time." See Cal. Code Regs. tit. 8, § 11040(2)(N).

**2. Application of Rule 23**

A district court may not certify a class unless the plaintiff has "established the four prerequisites of [Rule] 23(a)," see Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996), which are as follows: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." See Fed. R. Civ. P. 23(a).

Further, the plaintiff must establish "at least one of the alternative requirements of [Rule] 23(b)." See Valentino, 97 F.3d at 1234. Rule 23(b)(2), upon which plaintiffs herein rely, provides for certification of a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." See Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3), upon which plaintiffs herein also rely, provides for certification of a class where "the court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3).

**a. Rule 23(b)(2)**

"Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1195 (9th Cir. 2001). Here, plaintiffs seek "declaratory and injunctive relief to ensure that Hertz does not misclassify its Location Managers going forward." (See Pls.' Mem. of P. & A., filed September 17, 2010, at 29:2-3.)

//

5

Where a plaintiff seeks to certify a class under Rule 23(b)(2), such plaintiff must have standing to seek the declaratory and/or injunctive relief sought on behalf of the class. See Bates v. United Parcel Service, 511 F.3d 974, 983-85 (9th Cir. 2007) ("In a class action, standing is satisfied if at least one named plaintiff meets the [standing] requirements."); see also Morgan v. County of Yolo, 277 Fed. Appx. 734, 735 (9th Cir. 2008) (holding, where plaintiff's claim for "unpaid wages" was "moot," plaintiff "lacked standing to represent a class of employees").

Here, none of the named plaintiffs is presently employed by Hertz, and none claims to have any desire to return to work for Hertz as a Location Manager or otherwise.[4] Under such circumstances, plaintiffs have failed to show that any named plaintiff faces any likelihood of future injury from Hertz's classification practices. See, e.g., Walsh v. Nevada Dep't of Human Resources, 471 F.3d 1033, 1037 (9th Cir. 2006 (holding former employee who did not claim "any interest in returning to work" for defendant employer not entitled to seek injunctive relief regarding workplace policies). Consequently, plaintiffs are not entitled to seek, on behalf of a class, injunctive and/or declaratory relief with respect to Hertz's classification policies. See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1044-45 (9th Cir. 1999) (dismissing plaintiffs' claims for injunctive and declaratory relief where no named plaintiff showed "likelihood of future injury" from policy challenged on behalf of class; holding "[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief").

Accordingly, and irrespective of whether plaintiffs can satisfy each of the four prerequisites set forth in Rule 23(a), plaintiffs have failed to show certification under Rule 23(b)(2) is proper.

//

---

[4] Named plaintiffs Melinda Friend and John Nhieu were no longer employed by Hertz when they filed their initial complaint on September 6, 2007 (see Schneider Decl., filed January 7, 2011, ¶ 4), and named plaintiff Billy Hart was no longer employed by Hertz when he filed his initial complaint on November 3, 2008 (see id. ¶ 5). Named plaintiff Robert Higareda, at the time he filed his initial complaint on September 10, 2007, was on a "leave of absence," but, while still on leave, resigned on August 21, 2008. (See id. ¶ 4.)

### b. Rule 23(b)(3)

Rule 23(b)(3) "cover[s] cases in which a class action would achieve economies of scale, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchen Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997) (internal citation, quotation, and alteration omitted)

Here, plaintiffs assert, and Hertz agrees, that the primary issue presented by the instant action is whether Hertz properly classifies its Location Managers as "exempt" executive and/or administrative employees for purposes of California law.

Under California law, the determination of whether the "executive exemption" or the "administrative exemption" is appropriate requires a "fact-intensive inquiry," because the determination "must be based on a review of the actual job duties performed by [the] employee." See United Parcel Service Wage and Hour Cases, 190 Cal. App. 4th 1001, 118 Cal. Rptr. 3d 834, 842-43, 854 (2010). Indeed, with respect to the requirement, applicable to both the executive and administrative exemptions, that the employee be "primarily engaged" in "exempt work," the Code of Regulations provides that "[t]he work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies [the 'primarily engaged'] requirement." See Cal. Code Regs. tit. 8, §§11040(1)(A)(1)(e), 11040(1)(A)(2)(f).

The Ninth Circuit has explained that where, as in the instant case, the applicability of an exemption requires a "fact-intensive inquiry into each potential plaintiff's employment situation," such circumstance "militate[s] against certification" given that "courts must . . . ask where the individual employees actually spent their time." See In re Wells Fargo Home Mortgage Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009) (internal quotation and citation omitted). Where such circumstance pertains, and if the plaintiff is unable to establish the existence of "company-wide policies governing how employees spend their

time" or "uniformity in work duties and experiences that [would] diminish the need for individualized inquiry," class certification is inappropriate, given the need to hold "mini-trials with respect to each [class member's] actual work performance." See Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 947 (9th Cir. 2009).

Here, having reviewed the voluminous evidence offered by both parties, and, in particular, the deposition testimony of and declarations given by the four named plaintiffs and by twenty-two of the putative class members,[5] the Court finds plaintiffs have failed to show the duties performed by Location Managers are of a similar character and/or performed for a similar duration, such that issues common to the class would predominate over individual issues.  See, e.g., Marlo v. United Parcel Service, Inc., 251 F.R.D. 476, 482, 486 (C.D. Cal. 2008) (holding plaintiff not entitled to proceed on behalf of class of allegedly misclassified supervisors where plaintiff failed to show supervisors "perform[ed] similar duties"; noting supervisors' declarations and deposition testimony showed "variations in job duties that appear[ed] to be a product of employees working at different facilities, under different managers, and with different customer bases"); cf. Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586, 604-05 (E.D. Cal. 2008) (holding class certification of allegedly misclassified employees appropriate where plaintiffs demonstrated duties of putative class were "sufficiently similar").  In particular, the Location Managers testified not only as to a wide range of possible duties they may perform during any given workweek, but also gave differing testimony as to the amount of time spent on those tasks they did perform. See Jimenez v. Domino's Pizza, 238 F.R.D. 241, 251-52 (C.D. Cal. 2006) (denying motion for class certification as to claim alleging managers of restaurants were improperly classified as executive employees; holding that because evidence showed "there were many variable[s] which affected a particular manager's mix of duties,"

---

[5]Hertz has moved to strike the declarations of the four named plaintiffs, for the asserted reason such declarations were not provided to Hertz in conformity with the state court's scheduling order of October 22, 2008, which order was adopted by this Court. Given the timing of said order, its applicability to the subject declarations is unclear, and, as plaintiffs point out, the content of said declarations does not differ materially from that of their respective depositions.  Accordingly, the motion to strike will be denied.

8

predominant issue was "how much time the general managers spent on their various tasks, which "entail[ed] a need to conduct an individual inquiry for each class member").

Some duties were identified by most, and, in some instances, all, Location Managers. For example, all testifying and/or declarant Location Managers appeared to have engaged, in some capacity, in coaching, counseling, correcting, or otherwise overseeing the work performed by hourly employees; the amount of time spent on such tasks, however, varied considerably. (See, e.g., Colon Decl. ¶ 12 (declaration by Ivan Colon that he "spend[s] between 35 and 40% of [his] time supervising employees"); Daoud Decl. ¶ 14 (declaration by Issa Daoud that he spends "25 percent supervising, guiding and counseling [hourly employees]"); Kosta Depo. 108, Kosta Decl. ¶ 4 (testimony of Matthew Kosta that he "directly managed more than 150 employees on a daily basis," and declaration that "typically" such duty constituted less than 25-30% of his workday but "often" there were days he did not supervise others); Schultz Depo. 96-97 (testimony of David Schultz that he spends "probably 20%" of his time on Sundays "coaching" employees, "maybe between 5 and 10%" on Mondays, and that "it could be more" on Tuesdays through Thursday because "each day is different"); Nhieu Decl. ¶ 4 (declaration of John Nhieu that he "occasionally observ[ed] and coach[ed] employees"); Boseh Decl. ¶ 4 (declaration by Nelson Boseh that he "very rarely had time" to "supervise what was going on" with "hourly workers" in light of other duties).) In sum, the record does not indicate any commonality with respect to the time spent on oversight-related duties.

Other duties were identified by most, but not all, Location Managers, for example, involvement in the hiring and/or firing of hourly workers, which duty pertains to the executive exemption. See Cal. Code Regs. tit. 8, § 11040(1)(A)(1)(c). Some Location Managers testified they have hired and/or fired employees and also made recommendations for hiring and/or firing; such Location Managers, however, gave varying testimony as to the circumstances and/or frequency of such activities. (See, e.g., Zemedkun Depo. 61 (testimony of Demisse Zemedkun that he hired more than forty persons as "hikers," and, during "hiring week[s]," made recommendations to senior

9

management, who gave his recommendations "a hundred percent weight"); Daoud Depo. 52, 126 (testimony of Issa Daoud that he has hired "probably 30 to 40" persons as "transporters," and that when he makes a decision to fire an employee, he involves his superior "just out of courtesy"); Colon Decl. ¶¶ 33-34 (declaration by Ivan Colon that he has fired three people and has recommended others be fired, and has "participated in group interviews of applicants" in which those present collectively recommended whom to hire); Wallace Depo. 172-73 (testimony of Albert Wallace that he only hired transporters, the criteria for hiring being that the applicant passed a "drug screen test" and had a "decent driving record").) Other Location Managers testified that, although they did not directly hire or fire employees, they did make hiring and/or firing recommendations to senior management; such Location Managers gave varying descriptions as to the frequency with which he or she engaged in such activities and/or varying descriptions as to the weight each believed was given to his or her recommendations. (See, e.g., Coker Decl. ¶ 17 (declaration by Michael Coker that he has "interviewed applicants for CSR [customer service representative] positions and made recommendations as to who should be hired," and that those he recommended were hired); Henderson Decl. ¶ 5 (declaration by Brenda Henderson that she "sometimes interviewed potential hires and made recommendations" and that her "recommendations were not always followed"); Friend Decl. ¶ 6 (declaration by Melinda Friend that she "interviewed people and provided input" on "a few occasions").)[6] Again, given such lack of common experiences regarding hiring and firing activities, the trier of fact would need to consider the experiences of each of the individual Location Managers. See, e.g., Jimenez, 238 F.R.D. at 252 (finding class certification not appropriate where managers of chain stores had "different experiences" with respect to hiring and firing decisions; noting trier of fact would be required to perform "individualized inquiry" to determine if managers were properly classified as executive employees).

---

[6] Still other Location Managers declared they neither hired nor fired employees, nor had any involvement in making recommendations regarding hiring or firing. (See All Decl. ¶ 5; Boseh Decl. ¶ 5; McKeehan Decl. ¶ 5.)

10

Still other duties were identified by only one or two Location Managers. For example, one Location Manager testified that he gave two-day sales training classes to Hertz customer service representatives and thereafter monitored the representatives for compliance with the techniques they had been taught (see Wallace Depo. 93-95), and another testified he analyzed prices charged by competitors and thereafter made recommendations to senior management as to pricing at his location (see Cantor Depo. 46-47). The trier of fact would need to determine whether such tasks, as well as other tasks performed by only a few Location Managers, constitute exempt work, which determination necessarily would require examination of the duties performed by the individual Location Managers.

Additionally, Location Managers gave a wide variety of answers regarding how often, and under what circumstances, they performed the same duties as those performed by hourly employees, such as renting or moving vehicles. (See, e.g., Friend Depo. ¶ 5 (testimony of Melinda Friend that when employed as Location Manager for "fleet" department, she spent "more than seven hours a day" moving cars); Grewal Decl. ¶ 18 (declaration by Satwinder Grewal that it is "very rare that [he] will actually clean, rent or move a vehicle"); Kainz Decl. ¶ 22 (declaration by Gary Kainz that he spends "5 percent of [his] time cleaning, moving or rent cars"); Beck Decl. ¶ 4 (declaration by Krista Beck that she "probably spent up to 85 percent of [her] days performing the same tasks as the hourly employees," such as "washing cars, driving cars, and renting cars").) As to those Location Managers who testified or declared they spent a significant amount of time performing the same tasks as those performed by hourly employees, if the trier of fact were to credit that testimony, the trier of fact would then be required to determine whether such conduct diverged from Hertz's "realistic expectations" of Location Managers. See Ramirez v. Yosemite Water Co., Inc., 20 Cal.4th 785, 802 (1999). Such determination, in turn, would require consideration of, inter alia, "whether there was any concrete expression of employer dissatisfaction over an employee's substandard performance." See id. (observing that where exemption requires employee to spend more than 50% of time

11

performing exempt duties, employee that "falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption").  Here, Hertz has offered evidence that it was dissatisfied with the performance of some of its Location Managers, which expressions were tailored to perceived deficiencies in the individual Location Manager's job performance.  (See, e.g., Friend Depo. Ex. 29 (testimony of Melinda Friend that in response to said plaintiff's email reporting staffing shortages required her to spend too much time "renting," her superior responded that "[m]anagers should not be renting 4 hours a day and should not be renting if [one person is] the only manager on duty" and that she needed to "plan ahead" to avoid staff shortages); McKeehan Depo. 237, McKeehan Decl. ¶ 4 (declaration by Robert McKeehan that he "spent most days doing hourly work, which included renting cars, moving cars, and manning the exit gate," and testimony that he had been advised by his superior during a performance review that he was the "worst customer service manager [the superior] had ever worked with").)

Finally, Location Managers gave varying testimony as to the amount of discretion and judgment they could exercise while performing their duties.  (See, e.g., Daoud Decl. ¶ 28 (declaration by Issa Daoud that he is "not closely supervised" and is "provided the freedom [he] need[s] to do [his] job as [he] see[s] fit"); Abrams Depo. 65-66 (testimony of Cynthia Abrams that she "acted like a marionette" and "wasn't empowered" to "engag[e] [her] brain" and "make decisions").)  In light of such divergent testimony, plaintiffs have failed to show the determination of whether Location Managers "customarily and regularly exercise[ ] discretion and independent judgment," see Cal. Code Regs. tit. 8, §§ 11040(1)(A)(1)(d), 11040(1)(A)(2)(b), can be made without examining the circumstances of each individual Location Manager's job.

In short, plaintiffs have failed to show the existence of a "centralized" practice or policy requiring Location Managers to perform particular duties for particular lengths of time.  Cf., e.g., Wells Fargo Home Mortgage Overtime Pay Litig., 571 F.3d at 969 (observing, in context of claim that employer misclassified employees as "outside

1 salespersons," class certification likely would be appropriate if employer had "centralized
2 policy requiring employees to be at their desks for 80% of their workday"); Sav-On Drug
3 Stores, Inc. v. Superior Court, 34 Cal. 4th 319, 329-30, 343 (2004) (holding certification of
4 class of allegedly misclassified store managers proper where, inter alia, plaintiffs offered
5 evidence to show "the actual work performed by [the managers] on a daily basis was
6 identical in [defendant's] stores").  Nor have plaintiffs otherwise shown how the issue of
7 whether the subject exemptions were improper can be determined other than by examining
8 the particular circumstances of each such Location Manager's individual employment
9 situation.  See, e.g., Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229, 249, 253 (C.D.
10 Cal. 2006) (holding, where plaintiffs alleged store managers were misclassified, plaintiffs
11 failed to show common issues predominated over individual issues, where there was
12 "voluminous evidence that there actually was a great deal of variance in [managers']
13 duties"; observing that in "typical case" in which misclassification claim is certified on behalf
14 of class, "class members' duties are, or can be determined to be, roughly identical"), aff'd in
15 relevant part, 275 Fed. Appx. 672, 672 (9th Cir. 2008).  Consequently, plaintiffs have failed
16 to show that questions common to members of the class will predominate over questions
17 affecting only individual members of the class.

18    Accordingly, and irrespective of whether plaintiffs can satisfy each of the four
19 prerequisites set forth in Rule 23(a), plaintiffs have failed to show certification under Rule
20 23(b)(3) is proper.

## CONCLUSION

22    For the reasons stated above, plaintiffs' motion for class certification is hereby
23 DENIED, and defendant's motion to strike is hereby DENIED.

24    **IT IS SO ORDERED.**

26 Dated: February 24, 2011

MAXINE M. CHESNEY
United States District Judge

13